# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

vs.                                                                               No. CR 01-496 JP

RAINELL P. FREEMAN, SR.,

    Defendant.

## **MEMORANDUM OPINION AND ORDER**

On January 23 and 24, 2002, the Court held an evidentiary hearing on the Defendant's Motion to Suppress Evidence Illegally Obtained, filed November 2, 2002 (Doc. No. 24). Plaintiff, United States of America, was represented by Assistant United States Attorney James Braun; Defendant was personally present throughout the hearing and was represented by John D. Butcher and Scott M. Davidson, Assistant Federal Public Defenders. Plaintiff presented the testimony of Special Agents Jarrell Perry and David Tyree of the Drug Enforcement Administration and Defendant testified on his own behalf. Having carefully considered the testimony of the witnesses and the exhibits admitted at the hearing, as well as the arguments of counsel and the applicable law, the Court finds the facts to be as stated below, and concludes that the motion to suppress should be GRANTED.

FACTUAL FINDINGS

On April 2, 2001, Special Agents Jarrell Perry and David Tyree, along with other law enforcement officers who are members of a special interdiction unit, met the eastbound Amtrak passenger train while it was stopped at the Albuquerque, New Mexico train station around 12:30

p.m. Agent Perry was wearing khaki pants and a knit shirt with a fanny pack strapped around his waist. The pack was in front over his abdomen covered or partially covered by his knit shirt. Inside his fanny pack, but out of view, were handcuffs, a gun, and an ammunition magazine. Agent Perry did not wear any clothing that identified him as a law enforcement officer.

Agent Perry encountered a train passenger other than the defendant and asked to speak with him about the point of origin of his travel, his destination and his reason for being in California. In addition, Agent Perry asked to inspect that passenger's train ticket and apparently did so. A transcript of a tape recording of this encounter appears on pages 1, 2 and through line 11 on page 3 of Defendant's Exhibit A. To the best of Agent Perry's recollection, this passenger with whom Agent Perry first spoke was a white male.

Later, Agent Perry acted in a cover or backup capacity to Agent Tyree who was talking to a black male passenger. That passenger had been riding in the same coach car as Defendant Rainell Freeman, and in fact they had been sitting next to each other for at least part of the trip. At the beginning of that encounter, Mr. Freeman was outside the train on the platform. That encounter ended with the search of the other black passenger's luggage, which occurred in the common luggage storage area on the lower level of the coach car. That search did not result in an arrest. Mr. Freeman, who also is a black male, watched the latter part of the encounter between Agent Tyree and the other black passenger in the downstairs luggage area of the coach car. Agent Perry observed what he believed to be an unusual interest exhibited by Mr. Freeman in the encounter between Agent Tyree and the other black male passenger.

While Mr. Freeman was standing in the doorway of the downstairs entrance to the coach car, near the luggage area, Agent Perry showed his badge to Mr. Freeman and told him that he

was a police officer. Agent Perry asked, "May I speak with you?" and Mr. Freeman responded, "Yes." There was a brief exchange between Agent Perry and Mr. Freeman about where Mr. Freeman had been and his final destination. Agent Perry asked if he could see Mr. Freeman's train ticket and Mr. Freeman stated that it was upstairs, and he began walking up the staircase. As Agent Perry followed Mr. Freeman up the stairs, he turned on his audio tape recorder - this is reflected in the transcript of the audio tape at page 3, line 12, Defendant's Exhibit A. The remainder of the conversation that initially involved Mr. Freeman and Agent Perry, and later included Agent Tyree, was recorded and appears at Defendant's Exhibit A, page 3, line 14 through page 9.

Once they reached the upper level coach car, Agent Perry began the dialogue reflected in the transcript of the tape recording beginning at line 14, page 3, Defendant's Exhibit A, by asking Mr. Freeman, "Are you traveling by yourself today?" Soon thereafter, Agent Perry asked Mr. Freeman if he had been sitting "by the guy we was talking to?" and Mr. Freeman responded that he had.

Agent Perry then asked to see Mr. Freeman's train ticket, but did not advise that Mr. Freeman could decline this request. Mr. Freeman went to his seat on the upper level coach car, got his ticket folder from the seat, and gave it to Agent Perry. Agent Perry observed that the ticket was in the name of "Rainell Freeman" and that it was a one-way ticket to Columbus, Ohio through Chicago, Illinois that had been purchased for $279.00 in cash on April 1, 2001, the date of departure. After he had inspected the ticket, Agent Perry returned it to Mr. Freeman.

Next, Agent Perry advised Mr. Freeman that the law enforcement officers came to meet the train because of a "problem with contraband on the train" and explained "when I say

3

'contraband,' I am talking narcotics, weapons . . ."

Agent Perry then asked Mr. Freeman if he had any luggage and Mr. Freeman responded that it was downstairs. Agent Perry then said, "Could you, would you go and identify which luggage belongs to you, for me, sir?" and Mr. Freeman nodded, indicating that he would and walked to the stairs leading to the lower level luggage storage area. Agent Perry did not tell Mr. Freeman that he could refuse to identify his luggage. The luggage storage area was immediately across the lower level aisle from the base of the staircase down which Mr. Freeman and Agent Perry walked from the upper level. Upon arrival in the aisle of the lower level, Mr. Freeman could see Agent Tyree and another law enforcement officer eight to ten feet down the aisle from the luggage storage area.

Agent Perry asked Mr. Freeman if the luggage Mr. Freeman had identified was "the only piece of luggage that you have with you today, sir?" to which Mr. Freeman responded that it was. After a brief discussion about how long and where Mr. Freeman had been in California, Agent Perry asked, "Um, you don't have any kind of contraband or narcotics or anything like that?" to which Mr. Freeman responded, "No, no . . ." Agent Perry then immediately asked, "Are you going to allow me to search your baggage to make sure you don't have anything like that with you?" whereupon Mr. Freeman pulled his luggage, a hard-sided Samsonite suitcase, to the front of the lower luggage rack and unlatched the latches on the suitcase. Agent Perry never told Mr. Freeman that he could refuse to open his luggage. Agent Perry then said, "This is the only one that belongs – this is the only bag you have, right?" and Mr. Freeman responded, "Yeah." Next, Agent Perry lifted the Samsonite suitcase from the lower, floor level luggage rack to a mid-level luggage rack and opened it flat, exposing the contents of both sides of the suitcase.

Agent Perry then began looking through the clothes which were neatly stacked on the right-hand side of the open suitcase, and as he did this, Mr. Freeman placed the clothes being moved by Agent Perry on top of a black plastic trash bag that was in the left front side of the suitcase. This seemed like an attempt by Mr. Freeman to conceal the black plastic bag. Agent Perry then removed the clothes now covering the black plastic bag, noticed that the black bag appeared to be wrapped around something, and asked, "What's in this bag here?" Mr. Freeman responded, "Oh, that's my um . . ." Whereupon Agent Perry asked, "Would it be okay if I look, I search through here?" Mr. Freeman responded, "No, sir, that's just my camera." From approximately this point until Mr. Freeman was later placed in handcuffs, Mr. Freeman continuously placed his right hand palm down over the black plastic bag or the area inside the Samsonite suitcase where the black bag was located indicating to Agent Perry that he did not want Agent Perry to touch the black plastic bag or to remove it from the suitcase or to examine its contents. Agent Perry repeated, "Will it be okay if I search through this?" and Mr. Freeman reiterated, "No, sir. That's just my camera." Agent Perry then stated in the form of a question, "So you're telling me that I can't search through that right there then?" and Mr. Freeman responded, "I'm letting you go through my bag right now, sir."

Agent Perry then said that he was "going to go ahead and take it just to make sure there's not a weapon or anything in there" and Mr. Freeman responded, "No, it's not no weapon, sir." Agent Tyree then interjected, "Sir, he's going to go ahead and make sure." Agent Perry explained, "I can't let you put your [inaudible] there just for my safety. Sometimes, we have people that have weapons in here. Just for my safety, I'm not going to allow you to – I'm not going to allow you to put your hands in the bag, okay?" Mr. Freeman repeated that it was just his

5

camera and Agent Tyree remarked that, "He's just going to feel to confirm . . ." whereupon Agent Perry asked, "Can I confirm to make sure that's your camera then?" Mr. Freeman responded, "Yeah, you can just, you're going through it right now." After an inquiry about what brand of camera it was, Agent Perry once more asked for permission to look into the black plastic bag saying, "So will you allow me consent to go ahead and look in there, just to make sure it's a camera?" To that question, Mr. Freeman responded, "You're going through it right now, sir," which Agent Perry interpreted as an inconclusive response because he immediately said, "Okay, but I'm asking you a question. Can I go ahead and search through this . . . ?" Mr. Freeman's response was not audible. Mr. Freeman still had at least one of his hands somewhere inside the Samsonite suitcase and Agent Perry said, "Okay, I can't let you put your hand, I can't let you put your hand . . ." and Agent Tyree interrupted saying, "You gotta understand, sir, we've had [inaudible] people come out with guns in the past, okay? If it's just drugs and that, don't worry about that." Mr. Freeman retorted, "It's not drugs" and Agent Tyree asked if it were not a weapon to which Mr. Freeman said, "No, sir." Agent Perry felt that he still did not have permission or consent to look inside the black plastic bag so he then asked, "Are you going to allow me to open this to see what's inside of it then?" And Mr. Freeman responded, "Sir, that's my bag, that's my property. I'm letting you go through my stuff right now." While saying this, Mr. Freeman continued to have at least one hand over the black plastic bag inside the suitcase and Agent Tyree then stated, "Sir, I've asked you a number of times to remove your hands from the bag." An agent whose identity was not established then said, "Reach in the bag and make sure there's not a weapon in there, okay?" and Mr. Freeman responded, "It's not a weapon, sir, but it's . . ." Agent Tyree again warned Mr. Freeman, "Sir, you've got to keep your hands back. Don't

6

escalate this." Mr. Freeman responded, "Okay." At that point, Agent Perry opened the black plastic bag and observed vacuum-sealed clear plastic baggies which he immediately believed contained narcotics. Thereupon, Mr. Freeman was handcuffed and taken into custody and the recorded conversation ended shortly thereafter.

Agent Perry admitted that he never understood Mr. Freeman to give specific consent to a search of the contents of the black plastic bag; this was the reason Agent Perry repeatedly asked Mr. Freeman if he could look inside it.

The black plastic bag had been closed by twisting the top a couple turns; it had not been sealed or fastened shut. Agent Perry opened the black plastic bag by untwisting the top without having to damage or destroy it. It was later determined that the vacuum-sealed clear plastic baggies inside the black plastic bag contained crack cocaine.

After Mr. Freeman had been handcuffed, Agent Perry transported him to the Drug Enforcement Administration headquarters in Albuquerque, where Agent Perry read <u>Miranda</u> rights to Mr. Freeman from a printed card. Agent Tyree witnessed the reading of the rights. Mr. Freeman did not sign a written waiver of his rights, but he orally agreed to waive his rights. After reading each line of the printed card that contained the statement of rights, Agent Perry asked Mr. Freeman if he understood and Mr. Freeman responded that he did. Prior to questioning Mr. Freeman, Agent Perry had determined that Mr. Freeman had two prior felony convictions involving drug trafficking, plus other arrests; and Agent Perry informed Mr. Freeman that he knew of this criminal history before questioning him. Mr. Freeman then gave an inculpatory oral statement that he had made two prior trips from Ohio to California to pick up crack cocaine; that he had paid $8,000.00 per pound and later sold the crack cocaine for $16,000.00 per pound in

7

Chicago; that he operated alone; and that he would not identify his source of supply in California or say who his customers in Chicago were.

ANALYSIS

The government bears the burden of proving that consent was freely and voluntarily given. United States v. Sandoval, 29 F.3d 537, 539 (10th Cir. 1994). The determination of whether consent was voluntary is based on an evaluation of the totality of the circumstances. United States v. McRae, 81 F.3d 1528, 1536-37 (10th Cir. 1996); United States v. Santurio, 29 F.3d 550, 552 (10th Cir. 1994). The government must prove that consent was given without implied or express duress or coercion. United States v. McRae, 81 F.3d at 1537. To demonstrate voluntariness of consent, the government must proffer clear and positive testimony that consent was unequivocal and specific and freely and intelligently given. Id.

Consent need not be conveyed verbally. United States v. Gordon, 173 F.3d 761, 766 (10th Cir. 1999) (consent implied when defendant voluntarily handed luggage key to officer); United States v. Flores, 48 F.3d 467, 469 (10th Cir. 1995) (additional consent implied when defendant reopened trunk following conclusion of initial consensual search of trunk); United States v. Zapata, 18 F.3d 971, 977 (1st Cir. 1994) (defendant consented to search by providing keys to vehicle); United States v. McGuire, 957 F.2d 310, 314 (7th Cir. 1992) (defendant consented by handing bag to officer when asked what was in it). "[T]he dispositive issue is whether a reasonable law enforcement officer would have understood defendant's actions to indicate her voluntary consent to the search." United States v. Flores, 48 F.3d at 469.

The scope of a citizen's consent to search is defined by the search's express object and is

8

limited by the breadth of the consent given. United States v. Elliott, 107 F.3d 810, 814-15 (10th Cir. 1997). "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness--what would the typical person have understood by the exchange between the officer and the suspect?" Florida v. Jimeno, 500 U.S. 248, 251 (1991). "A suspect may of course delimit as he chooses the scope of the search to which he consents." Id.

Assessing the foregoing factual findings, considering the totality of the circumstances, and evaluating the matter in the light of the relevant law, the Court concludes that the initial encounter between Mr. Freeman and Agent Perry was consensual. Mr. Freeman freely and voluntarily gave his consent to speak with Agent Perry. Further, Mr. Freeman freely and voluntarily gave his consent for Agent Perry to examine his train ticket. By voluntarily walking downstairs to the common baggage area with Agent Perry and by his non-verbal conduct of cracking open the latches, Mr. Freeman freely and voluntarily identified his suitcase and gave his consent for Agent Perry to search inside his suitcase. This initial non-verbal consent by Mr. Freeman to search his suitcase was general and not limited, entitling Agent Perry to search the entire contents of the suitcase unless by doing so he would have to destroy a sealed container therein, *see* United States v. Osage, 235 F.3d 518, 520-21 (10th Cir. 2000) (holding that opening of sealed tamale can, rendering it useless, exceeded scope of consent to search suitcase), or unless Mr. Freeman later limited or revoked his consent to search inside the suitcase.

Voluntary consent to search can be limited, revoked or withdrawn by a citizen at any time before the development of reasonable suspicion or probable cause to believe criminal activity is afoot. United States v. Felix, 134 F. Supp. 2d 162, 172 (D. Mass. 2001) ("individual's power to

9

consent to a search necessarily entails the right to withhold consent altogether, to limit the consent search in any manner, to revoke one's consent (prior to the discovery of evidence by police), and to terminate a search already in progress"); see United States v. West, 219 F.3d 1171, 1178 (10th Cir. 2000) (declining to reach issue of whether defendant had withdrawn consent prior to seizure of drugs located in locked briefcase inside trunk of vehicle because by time briefcase was found, there was probable cause to search zippered bag, rendering consent irrelevant); United States v. Ho, 94 F.3d 932, 938 (5th Cir. 1996) (suppressing evidence because no probable cause at time defendant revoked consent to search portfolio); United States v. Dyer, 784 F.2d 812, 816 (7th Cir. 1986) (police must honor limitation or withdrawal of consent to search before illegal substances discovered); Goldberg v. State, 407 So.2d 352 (Fla. App. 1981) (holding it was error to deny suppression motion where defendant withdrew consent to search luggage before police developed probable cause).

The government relies on Mr. Freeman's continuing and unlimited consent to search the suitcase to justify the search of the contents of the black plastic bag. Counsel for the government explicitly acknowledged that no exigent circumstances existed to justify searching inside the black plastic bag, and that there was neither reasonable suspicion nor probable cause to justify searching the interior of the black plastic bag.

The standard for limiting, revoking or withdrawing consent is also one of objective reasonableness. *See* Florida v. Jimeno, 500 U.S. at 251 (using standard of objective reasonableness in measuring scope of consent). The standard has been thus described by one court: "[T]he consenter must clearly inform the appropriate official that the initial consent has been limited, withdrawn or revoked." State v. Stanford, 474 N.W.2d 573, 575 (Iowa 1991). *See*

*also,* United States v. Ibarra, 731 F. Supp. 1037, 1039-40 (D. Wyo 1990) (suppressing evidence found in second search of vehicle trunk because defendant had previously revoked consent to search trunk by closing and locking it), *aff'd on other grounds,* 955 F.2d 1405 (10th Cir. 1992); United States v. Ross, 263 F.3d 844, 846 (8th Cir. 2001) ("[defendant's] expressions of impatience did not amount to an 'unequivocal act or statement of withdrawal' indicating an intent to revoke his consent") (*quoting* United States v. Martel-Martines, 988 F.2d 855, 858 (8th Cir. 1993)); United States v. Ho, 94 F.3d at 934 (revocation of consent to search portfolio accomplished by defendant unsuccessfully struggling to retrieve portfolio when officer found plastic card inside it).[1]

After Agent Perry began the search of the suitcase, but before Agent Perry had reasonable suspicion or probable cause to believe there was contraband (either narcotics or a weapon) in it, Mr. Freeman by his words and actions effectively limited the scope of his consent to search his suitcase and made it clear that his consent did not extend to touching, lifting, squeezing, opening, or searching the contents of the black plastic bag that was inside his suitcase. Mr. Freeman had a reasonable expectation of privacy in the contents of the black plastic bag.

Despite Agent Perry's repeated requests for consent to search the inside of the black plastic bag, Mr. Freeman never gave consent orally or by non-verbal conduct, and Agent Perry

---

[1] The United States asserts that the standard for withdrawal of consent should be whether the suspect affirmatively made an unequivocal act or statement indicating his intent to withdraw consent. It cites for this proposition Davis v. United States, 512 U.S. 452 (1994), in which the United States Supreme Court held that the police are not required to cease questioning a suspect who has waived his Miranda rights unless he "articulate[s] his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." Id. at 459. I am loathe to equate consent issues involving Miranda rights of persons in custody with consent issues for persons not in custody, but that is not a concern here because the United States seems to be merely arguing for the same objective reasonableness standard that I am using.

believed he had never received Mr. Freeman's specific consent to search inside the black bag. It was not objectively reasonable for Agent Perry to believe that Mr. Freeman had not limited his consent to search the suitcase to exclude the black plastic bag. Any "typical person" (Jimeno, 500 U.S. at 251) or any "reasonable police officer in the circumstances" (Davis, 512 U.S. at 459) would have understood that Mr. Freeman was limiting the scope of his consent to search his suitcase to exclude a search of the black plastic bag.

Where a defendant contends consent to search was limited, courts that uphold an expanded search often cite the defendant's failure to object when an officer allegedly exceeded the scope of the consent. *See, e.g.,* United States v. Gordon, 173 F.3d at 766 (holding search of locked duffel bag inside suitcase valid where defendant gave key to agent and did not object to search of locked bag: "We consistently and repeatedly have held a defendant's failure to limit the scope of a general authorization to search, and failure to object when the search exceeds what he later claims was a more limited consent, is an indication the search was within the scope of consent."); United States v. Pena, 143 F.3d 1363, 1368 (10th Cir. 1998) (search of hotel room bathroom valid where suspect consented to officer's request to "look in" hotel room and failed to object when officer entered bathroom). Here, in contrast, Mr. Freeman repeatedly objected both verbally and by his conduct when Agent Perry attempted to view, touch, and search the contents of the black plastic bag.

The warrantless search of the black plastic bag inside Mr. Freeman's suitcase was not justified by free and unequivocal consent; it was not justified by exigent circumstances; and it was not justified by reasonable suspicion or probable cause. Hence, the search was unreasonable and in violation of Mr. Freeman's rights under the Fourth Amendment of the United States

Constitution. Therefore the contents of the black plastic bag located inside Mr. Freeman's suitcase must be suppressed, and Mr. Freeman's inculpatory statements made after his arrest must be suppressed as fruit of the poisonous tree as directed by Wong Sun v. United States, 371 U.S. 471, 488 (1963).

IT IS THEREFORE ORDERED THAT:

1. Defendant Rainell Freeman's Motion to Suppress is GRANTED; and

2. The contents of the black plastic trash bag located inside the Defendant's suitcase and Defendant's later inculpatory statements may not be admitted into evidence at trial.

_____
CHIEF UNITED STATES DISTRICT JUDGE